USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC# _____
DATE FILED: ___7/2/13___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

RICARDO CRUZ,                                   :

               Plaintiff,        :              12 Civ. 7346 (PAC) (AJP)

        -against-                  :        **REPORT AND RECOMMENDATION**

CAROLYN W. COLVIN, Commissioner of     :
Social Security,
                            :

            Defendant.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable Paul A. Crotty, United States District Judge:**

Plaintiff Ricardo Cruz, represented by counsel, brings this action pursuant to § 205(g)

of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of the Commissioner

of Social Security (the "Commissioner") denying him Supplemental Security Income ("SSI")

benefits. (Dkt. No. 1: Compl.) Presently before the Court are the parties' cross-motions for

judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). (Dkt. Nos. 11 & 15: Notices of

Motion.)

For the reasons set forth below, the Commissioner's motion for judgment on the

pleadings should be DENIED and Cruz's motion for judgment on the pleadings should be

GRANTED to the extent of remanding the case to the Commissioner.

## FACTS

### Procedural Background

On August 4, 2009, Cruz applied for SSI benefits, alleging that he was disabled since

April 24, 2009. (Dkt. No. 9: Administrative Record Filed by the Comm'r ("R.") 12, 79-80, 102,

106.) Cruz alleged disability due to abdominal pain related to hernia surgery and depression. (R. 41-42, 106, 126, 145.) Upon initial review, the Social Security Administration ("SSA") found that Cruz was not disabled and denied his application. (R. 52-55.) On January 6, 2010, Cruz requested an administrative hearing. (R. 56-58.)

Administrative Law Judge ("ALJ") Jerome Hornblass conducted a hearing on August 17, 2010. (R. 23-48.) Cruz appeared at the hearing with his attorney. (R. 23, 25.) On November 30, 2010, ALJ Hornblass issued a written decision finding that Cruz was not disabled. (R. 9-19.) ALJ Hornblass' decision became the Commissioner's final decision when the Appeals Council denied review on August 27, 2012. (R. 1-3.)

The issue before the Court is whether the Commissioner's decision that Cruz was not disabled is supported by substantial evidence.

**Non-Medical Evidence**

Cruz was born on December 17, 1976 and was thirty-two years old at the alleged onset of his disability. (R. 18, 25, 33.) Cruz speaks and reads English, graduated from high school, and attended college for two years. (R. 26, 105, 110.) Cruz previously worked as an after-school tutor, limousine driver, delivery person, and parking attendant. (R. 27-29, 107, 112-18, 134-38, 161-68.) Cruz lives in Manhattan with his mother, who does the shopping, cooking, and cleaning for the household. (R. 42-43.)

In 2003, Cruz suffered a gunshot wound to the abdomen and underwent several surgeries as a result. (R. 26-27, 29-30, 36.) Cruz continued to work for approximately six years after the gunshot injury occurred, until April 2009. (R. 40-41.) In 2009, Cruz was hospitalized for about three months when one of his surgeries resulted in an abdominal infection. (R. 30, 43.) After this, Cruz was assisted for about six months by a home health aid who cleaned his wound. (R. 30,

43.) Cruz used a "binder" around his stomach that he removed to shower. (R. 39, 158.) Cruz occasionally experienced sharp pains in his stomach, and he takes OxyContin three times a day to help with the pain. (R. 34, 37-38.)

Cruz described his condition and daily activities in a form dated August 26, 2009. (R. 124-40.) At the time, Cruz had a "v.a.c. machine" attached to his stomach and thus had to be "on bed rest" all day and could not shave, care for his hair, or bathe himself. (R. 128-29, 158.) Cruz left the house only for doctor's appointments and never left the house unaccompanied. (R. 46, 128.) Cruz's activities included reading, talking on the phone, and watching television, and he reported no problems getting along with family and friends. (R. 129-30.) Cruz was able to follow instructions, remember things, and pay attention. (R. 131-32.) He said he was "not able to lift, stand, walk, sit, climb stairs, kneel, [or] squat." (R. 130.) He only could walk for about half a block before needing to rest for five minutes. (R. 32, 131, 158.)

At the ALJ hearing on August 17, 2010, Cruz reported that he began to receive mental health treatment in November 2009 and gets psychiatric treatment three times a month. (R. 37.) Cruz took Zoloft, which helped him improve his mood somewhat. (R. 37, 42.) Cruz saw a doctor for pain management. (R. 37-38.) Cruz does not like crowds, dealing with people, or being social. (R. 34-35.) During a typical day, Cruz takes a walk, reads books, and uses a computer. (R. 38.) A friend often visits Cruz at his home, keeping him company. (R. 38-39.) Cruz can shower and dress himself. (R. 42-43.) Between pain management, psychiatry and surgery related doctor appointments, he has five to six doctor visits a month. (R. 40.)

## Medical Evidence

### Physical Condition

#### Treating Physicians

##### St. Luke's-Roosevelt Hospital

Cruz's abdominal gunshot wound was treated with an exploratory laparotomy without intervention. (R. 202-03, 216, 262, 298, 305.) On January 28, 2009, a CT scan of Cruz's pelvis and abdomen revealed a 1.7 cm midline ventral hernia related to the 2003 laparotomy. (R. 262-63, 447-48.)

On April 24, 2009, Dr. Susan Talbert at St. Luke's-Roosevelt Hospital performed a type of ambulatory surgery (R. 215-18, 295-98, 455-56) called open incisional hernia repair with mesh on Cruz's wound (R. 190-91, 217). Aside from noting obesity and a well-healed scar, Dr. Talbert's examination findings basically were normal. (R. 216.) Cruz received treatment after his surgery, including a blood transfusion. (R. 215.) A hematoma drained through Cruz's wound. (R. 215.) On discharge, Cruz was ambulatory and his pain was controlled. (R. 215.) Cruz received a prescription for Tylenol. (R. 296.)

On May 7, 2009, Dr. Talbert examined Cruz's post-surgery recovery. (R. 259.) Cruz did not require pain medication, denied any symptoms, and could perform his daily activities normally. (R. 259.) Dr. Talbert's findings were unremarkable and she described Cruz's recovery as "stable." (R. 259.) Dr. Talbert removed Cruz's surgical staples and performed further wound care. (R. 259.) Dr. Talbert renewed the prescription for an abdominal binder and Percocet. (R. 259.) Cruz returned to Dr. Talbert on May 21, 2009 and generally was healing well. (R. 258.)

On June 13, 2009, Cruz sought treatment at St. Luke's for swelling at his surgical site. (R. 255-57.) Dr. Jeffrey Rabrich diagnosed post-operative pain, discharged Cruz in stable condition,

and told him to follow up with his physician. (R. 254, 256.) Five days later, Cruz visited Dr. Talbert because his skin had "bubbled up" at the incision site. (R. 253.) Dr. Talbert found a one-centimeter fluid-filled nodule with no draining, purulence or erythema. (R. 253.)

On June 22, 2009, Cruz again returned to St. Luke's, where a physician observed the incision site and found brown serous fluid, likely evincing a liquified hematoma. (R. 252.) Cruz returned, as instructed, on June 25, 2009 and was seen by Dr. Talbert. (R. 251.) Dr. Talbert noted a recent cyst at the site, but observed that the wound was closing. (R. 251.) Dr. Talbert instructed Cruz to use dry gauze and to continue to change the dressing twice daily. (R. 251.)

On July 2, 2009, Drs. Talbert and Myers treated Cruz. (R. 209-10, 250.) Cruz reported two new blisters at the site, but reported only minimal pain and denied other symptoms. (R. 209, 250.) Dr. Myers' diagnosis was status post ventral hernia repair with mesh and skin blistering and an infected hematoma that was likely liquified. (R. 210, 250.) The doctors recommended that Cruz be admitted to the hospital, administered intravenous ("IV") fluids, and given additional tests. (R. 210, 250.)

The next day, July 3, 2009, Cruz was admitted to St. Luke's and reported drainage, wound swelling, and mild pain. (R. 203-08, 274-92.) Cruz's psychiatric history was negative for anxiety and depression. (R. 203.) Dr. Peter Fontana diagnosed wound infection and Cruz was given antibiotics by IV. (R. 204, 208.) Cruz declined pain medication. (R. 204.) Tests revealed that the area around Cruz's abdominal mesh was infected and doctors decided to remove the mesh. (R. 192, 211-14, 260-61.) On July 7, 2009, Dr. Talbert conducted an exploratory laparotomy, removing the infected mesh and closing the fascia using alloderm mesh and peritoneal lavage. (R. 187-89, 214, 268-72.) Cruz had no complications from the surgery (R. 214) and was discharged on July 13, 2009

(R. 274-76).  Cruz was prescribed a vacuum dressing and Percocet, and instructed to follow up at the clinic in one week and avoid lifting.  (R. 275-76.)

During July, August and September 2009, Cruz visited St. Luke's for follow-up visits. (R. 246-49.)  Attending physicians observed a satisfactory course of healing and Cruz denied pain or any problems.  (R. 246-49.)  The physicians instructed Cruz to use the vacuum dressing and Curasol.  (R. 246-47.)  While a greenish discharge was observed on September 10, 2009, there was healthy tissue granulation and no sign of purulence or bleeding.  (R. 246.)

### Ryan Center

Seeking a referral for continued treatment, Cruz visited the William Ryan Community Health Center on September 23, 2009.  (R. 303-04.)  Cruz denied any symptoms or pain. (R. 303-04.)  Eddie Sung, a physician assistant, reported that Cruz had an open surgical wound and ventral hernia.  (R. 303-04.)  Sung ordered a surgical consultation and recommended that Cruz visit his primary care physician in a month.  (R. 304.)

On October 23, 2009, Dr. Donzella Dixon examined Cruz.  (R. 305-07.)  Cruz was experiencing abdominal pain and stated that he wanted permanent disability.  (R. 305.)  At the time, Cruz was visiting St. Luke's once a month and taking OxyContin for pain.  (R. 305.)  Dr. Dixon examined Cruz and assessed a healing surgical wound and depression.  (R. 306.)  Dr. Dixon referred Cruz for a mental health consultation; she reassured him that the wound would heal, that he should seek employment, and that "[p]ermanent disability [is] not suggested at this time."  (R. 306.)

### Return To St. Luke's

On October 1, 2009, Cruz told Dr. Talbert that he was changing his dressing daily and was doing well.  (R. 245.)  Cruz returned to St. Luke's surgery clinic on November 11, 2009 and was attended by Dr. Schwartz.  (R. 244.)  Cruz described occasional sharp abdominal pains and

denied other symptoms. (R. 244.) Dr. Schwartz reported that Cruz's abdomen was obese and that there was a 0.5 cm area of granulation on the wound. (R. 244.) Cruz's wound was sealed and silver nitrate was applied to the granulation. (R. 244.) Dr. Schwartz's diagnosis was that Cruz was doing well following the removal of the infected mesh and the repair of the site with alloderm mesh. (R. 244.)

On December 10, 2009, Dr. Talbert found that Cruz's wound had closed and Cruz denied any complaints. (R. 243.) Aside from noting that Cruz had gained weight, Dr. Talbert's examination was unremarkable. (R. 243.) Dr. Talbert advised Cruz to lose weight and to continue wearing the abdominal binder. (R. 243.)

## Astramed Physician P.C.

On May 5, 2010, Cruz visited a clinic run by Astramed Physician P.C. and was seen by Dr. Kevin Lowe. (R. 237.) Cruz complained of pain and stated that OxyContin provided relief, but Percocet did not. (R. 237.) Dr. Lowe, commenting on Cruz's medical history, noted that Cruz had suffered a gunshot wound and resulting chronic pain syndrome. (R. 237.) Examining Cruz, Dr. Lowe observed some limitations in Cruz's range of motion ("ROM") of the anterior abdomen and lower back region. (R. 237.) Dr. Lowe advised Cruz to stop taking Percocet and prescribed OxyContin. (R. 237.) Cruz visited Dr. Lowe again on June 4, 2010, seeking a medication refill. (R. 238.) On July 7, 2010, Dr. Lowe ordered an MRI of Cruz's abdomen. (R. 239.) Dr. Lowe also noted that Cruz received relief from OxyContin and that his pain score was "1." (R. 239.)

When Cruz visited Dr. Lowe on August 9, 2010, Dr. Lowe informed him that Dr. Tomasito Virey, a colleague at Astramed Physician, would send a letter to Cruz's attorney for his "appeal for disability." (R. 240.) Dr. Lowe, accounting for Cruz's medical history, included chronic pain syndrome in his assessment. (R. 240.) He again prescribed OxyContin, which Cruz confirmed

helped relieve his pain. (R. 240.) Dr. Virey wrote a note addressed "To whom it may concern" dated August 9, 2010. (R. 235.) Dr. Virey noted that Cruz had undergone three abdominal surgeries, had chronic pain syndrome, and was in treatment for depression at the Ryan Center. (R. 235.) Dr. Virey offered his opinion: "I feel, [Cruz], will not be able to work at least for one year because of [his] conditions." (R. 235.)

### Consultative Physician

On October 14, 2009, Dr. Zobidatte Moussa, an internal medicine physician, evaluated Cruz at the SSA's request. (R. 219.) Cruz reported intermittent pain at the incision site. (R. 219.) While he was pain free at the time, Cruz reported that sometimes he had severe pain ("10/10") when he bent over or walked for a block, but the pain disappeared when he stood up or rested. (R. 219.) Cruz did not report any other symptoms. (R. 219.) Cruz could care for himself, although he needed some assistance with dressing. (R. 220.) Cruz's activities included reading, socializing with friends, and watching television. (R. 220.) According to Dr. Moussa, Cruz's gait was normal, although he could only squat "halfway" due to abdominal pain. (R. 220.) Cruz needed no assistance in changing for the examination, rising from a seated position, or getting on and off the examination table. (R. 220.) Cruz used a cane, but Dr. Moussa did not believe that it was necessary. (R. 220.) Dr. Moussa's examination found tenderness around the surgical wound and a partially reduced range of lumbar motion. (R. 221-22.) Dr. Moussa diagnosed a gunshot wound to the abdomen and an ensuing mesh infection. (R. 222.) Dr. Moussa reported moderate limitations on lifting, bending, and walking due to infection of the abdominal surgical wound. (R. 222.)

### Mental Condition

On November 9, 2009, Lynn Kennedy, a licensed clinical social worker at Ryan Center, conducted an initial evaluation of Cruz. (R. 344, 368-92.) Kennedy reported that Cruz's

mood was depressed, his affect showed anxiety, and he had mild memory deficits. (R. 368-70.) Cruz's cognitive functioning was average. (R. 370.) Cruz reported that although he was independent in decision-making and walking, he required assistance in cooking, traveling, shopping, and managing finances. (R. 375.) Kennedy diagnosed Cruz using a multiaxial system of analysis: Axis I, major depressive episode, with post-traumatic stress disorder and major depressive disorder with psychotic features to be ruled out; Axis II, deferred; Axis III, gun shot of the left hip, hernia surgery; Axis IV, isolation; and Axis V, global assessment of functioning ("GAF") at 51 to 55, contemporaneously and for the year previous. (R. 371.)[1/] Kennedy recorded the onset of Cruz's mental health disorder as 2003 and noted that he "became very isolated after [the] shooting." (R. 374.) Kennedy also noted that the onset of the current episode of his mental health disorder occurred in July 2009, the date of his last surgery. (R. 374.)

On November 23, 2009, Dr. Jan Roda, a psychiatrist at the Ryan Center, saw Cruz. (R. 366-67.) Dr. Roda observed that Cruz had fair hygiene and was casually dressed. (R. 366-67.) Cruz spoke in a low tone and his psychomotor activity was decreased. (R. 367.) Cruz stated that he had a depressed mood and lacked energy. (R. 367.) Cruz's concentration was impaired and his affect was anxious. (R. 367.) Dr. Roda diagnosed depressive disorder not otherwise specified ("NOS") and recommended Zoloft and psychotherapy. (R. 367.)

---

[1/]   The multiaxial system of analysis is used to assess a patient's physical and mental condition along five axes, each referring to a specific domain of information. Axis I pertains to clinical disorders; Axis II pertains to personality disorders; Axis III pertains to general medical conditions; Axis IV pertains to environmental and psychosocial problems; and Axis V references the patient's GAF. A GAF of 55 indicates moderate symptoms or moderate difficulty in occupational, school and social functioning. Diagnostic and Statistical Manual of Mental Disorders 27-34 (4th ed. rev. 2000).

On November 30, 2009, Kennedy met with Cruz to formulate a treatment plan. (R. 342, 361-65.) Cruz related being able to travel independently and having good cognitive function. (R. 361.) Cruz also described having a depressed mood and low energy, symptoms that had worsened since his 2009 surgery. (R. 342.) Cruz noted that he did not experience any side effects from Zoloft. (R. 342.) Kennedy diagnosed depressive disorder NOS, and Cruz's GAF continued at 51 to 55. (R. 342, 361.)

On December 7, 2009, Cruz returned to Dr. Roda who noted a depressed mood. (R. 340.) Cruz confirmed that he did not experience any side effects from Zoloft. (R. 340.) Dr. Roda increased Cruz's Zoloft dosage and reaffirmed his depressive disorder NOS diagnosis. (R. 340.) On December 14, 2009, Cruz saw Kennedy, who repeated many of her earlier findings, noting that Cruz had low energy, low interest and isolative behavior. (R. 338.) Kennedy reported that Cruz had a "tendency to feel withdrawn" after he was shot. (R. 338.) Kennedy also noted that Cruz had other medical problems which exacerbated his mood. (R. 338.) On December 28, 2009, Cruz again saw Dr. Roda, who repeated his depressive disorder NOS diagnosis and prescription of Zoloft. (R. 334, 338.)

On December 29, 2009 and January 12, 2010, Cruz visited Kennedy. (R. 330, 332.) Kennedy reported that Cruz had a happier affect and a brighter mood. (R. 330, 332.) Cruz reported that he met with a nutritionist and developed a plan to "revamp[ his] diet" and lose weight. (R. 330, 332.) Kennedy's diagnosis and treatment plan remained the same, and she urged Cruz to increase his activities. (R. 330, 332.)

Dr. Claude Laniado, a psychiatrist at the Ryan Center, first saw Cruz on January 26, 2010. (R. 395.) Cruz stated that he felt slightly better. (R. 395.) Dr. Laniado reported a somewhat restricted mood and diagnosed depressive disorder NOS. (R. 395.)

On February 2, 2010, Cruz saw Kennedy, who noted that Cruz's mood was improved, although he felt self-conscious about having gained weight. (R. 397.) Cruz also reported "sleep disturbance." (R. 397.) Kennedy recommended that Cruz attend a local recreational center to volunteer and get active. (R. 397.)

On February 23, 2010, Cruz again met with Dr. Laniado, who reported that Cruz's mood was "slightly sad." (R. 398.) While Dr. Laniado's diagnosis remained the same, he recommended an increase in Cruz's Zoloft dosage. (R. 398.)

In early March 2010, Cruz told Kennedy that he was getting out of the house more and was doing "ok." (R. 400.) Cruz expressed a desire to take swimming lessons, socialize more, and possibly begin working. (R. 400.) In a newly-completed treatment plan, Kennedy again recorded Cruz's GAF score as 51 to 55. (R. 356-60.) Kennedy noted Cruz's progress and suggested that he continue the prescribed treatment. (R. 356.)

Dr. Laniado saw Cruz on March 23 and April 8, 2010. (R. 401, 404.) Dr. Laniado repeated his diagnosis of depressive disorder NOS and, at the March 23 visit, recommended increasing Cruz's Zoloft medication. (R. 401.)

Cruz visited Kennedy on March 30, 2010 and reported an improved mood and "some concern about his health." (R. 403.) Cruz reported that abdominal pain was disrupting his sleep. (R. 403.) Cruz was spending his time at home, using a computer and watching television. (R. 403.) Kennedy continued to encourage Cruz to participate in activities. (R. 403.)

On April 13, 2010, Kennedy reported that Cruz had a "brighter mood and affect." (R. 406.) Cruz related that he had not been out in a few weeks and was spending his days sleeping and watching television. (R. 406.) Kennedy encouraged him to exercise and participate in other activities. (R. 406.) On May 4, 2010, Kennedy noted that Cruz was smiling and had a brighter

mood. (R. 407.) Cruz reported that he walked over the weekend and was feeling better. (R. 407.) Cruz also was working to improve his diet. (R. 407.)

Dr. Laniado met with Cruz on May 6 and June 8, 2010, repeated his earlier diagnosis of depressive disorder NOS, and instructed Cruz to continue to take Zoloft. (R. 409, 413.)

On May 25, 2010, Cruz saw Kennedy. (R. 411.) Cruz had a "brighter" mood and reported that he had been biking and getting out more. (R. 411.) In a treatment plan Kennedy completed on June 2, 2010, she reported that Cruz was progressing and she increased his GAF score to 55. (R. 351.) When Kennedy next met with Cruz on June 22, 2010, she reported a brighter mood. (R. 415.) Cruz told her that he was biking and seeing his children more often. (R. 415.)

Because of Dr. Laniado's resignation, Dr. Perry Branson, a Ryan Center psychiatrist, examined Cruz on July 7, 2010. (R. 417.) Dr. Branson recorded that Cruz had an adequate response to Zoloft and had no side effects. (R. 417.) Cruz stated that gastrointestinal pain interrupted his sleep. (R. 417.) Dr. Branson found it "[o]f note, [that Cruz] has [a] disability claim pending." (R. 417.) Dr. Branson diagnosed depressive disorder NOS and continued to prescribe Zoloft. (R. 417.)

In a letter to Cruz's attorney dated July 9, 2010, Dr. Branson and Kennedy described Cruz's treatment and symptoms since he became a patient at the Ryan Center in November 2009. (R. 233.) They reported that Cruz had "demonstrated lower interest, concentration, energy and apprehensiveness to a marked degree." (R. 233.) After qualifying that the Ryan Center does not conduct work assessments, Dr. Branson and Kennedy opined that it "appears" that Cruz's capacity to conduct work-related tasks is limited "at present" and that Cruz was "at least temporarily unable to resume work related activity." (R. 233.) Dr. Branson and Kennedy, however, noted that Cruz's "mental health issues appear secondary to his medical issues." (R. 233.)

On August 4, 2010, Dr. Branson saw Cruz and repeated his earlier findings that Cruz responded adequately to Zoloft and had no side effects. (R. 421.) Cruz reported that he was not watching his diet and had stopped exercising because "he doesn't feel like it any more." (R. 421.) Dr. Branson recorded that it was "[o]f note" that Cruz had a disability application pending and that he might be seeking "significant secondary gain," presumably receipt of benefits, through his treatment. (R. 421.) Dr. Branson noted, however, that this would be difficult to adequately determine unless the frequency of treatment were increased. (R. 421.)

The next day, on August 5, 2010, Cruz saw Kennedy. (R. 423.) Cruz reported that he was seeing his children almost every week and that he was getting out of the house for swimming and biking. (R. 423.) Kennedy's diagnosis remained the same. (R. 423.) On August 26, 2010, Cruz told Kennedy that his sleep improved, but his mood was still anxious. (R. 425.) In a September 3, 2010 treatment plan, Kennedy increased Cruz's GAF score range to 55 to 58 and indicated that Cruz was making progress. (R. 346.)

On September 23, 2010, Cruz told Kennedy that he had little motivation to exercise and lose weight. (R. 427.) Although he expressed a desire to work again, Cruz wanted to feel physically fit before doing so. (R. 427.) Kennedy, in addressing the ongoing benefit claim, explained to Cruz that he may qualify for temporary disability, but he would not qualify on the basis of mental health. (R. 427.)

### Evidence Not Available To The ALJ But Submitted To The Appeals Council: Dr. Virey's Multiple Impairment Questionnaire

Dr. Virey's treatment records were not available for review by the ALJ and are not part of the certified administrative record. (R. 17.)[2] Dr. Virey did, however, complete a Multiple Impairment Questionnaire, which Cruz submitted to the Appeals Council. (R. 438-45.) Dr. Virey reported that Cruz was treated monthly at the clinic since May 2010. (R. 438.) Dr. Virey's diagnosis was chronic pain syndrome due to gunshot wound of the abdomen and status post ventral abdominal hernia repairs. (R. 438.) In support of his diagnosis, Dr. Virey reported clinical findings of vague, generalized abdominal discomfort, reproducible by deep palpitation. (R. 438.) Cruz's symptoms were ongoing nausea and vomiting, weight loss, easy fatigability, and generalized abdominal discomfort. (R. 439.) Dr. Virey also cited CT scans and x-ray findings. (R. 439.) Cruz's pain was rated four to seven on a ten-point scale, indicating moderate to moderately severe pain. (R. 440.) Cruz's fatigue was rated two to three, or mild. (R. 440.)

Dr. Virey opined that during an eight-hour workday, Cruz could sit for one hour total and stand or walk for one to two hours total. (R. 440.) According to Dr. Virey, Cruz's fatigue, pain, and other symptoms frequently were severe enough to disrupt his attention and concentration. (R. 443.) Cruz's functional limitations were further complicated by depression and emotional upset; Cruz only was capable of handling low stress. (R. 443.) In response to the question "Is your patient a malingerer?" Dr. Virey checked "No." (R. 443.) Dr. Virey found that Cruz required ten to twenty minute rest breaks every hour to one-and-a-half hours during an eight-hour workday. (R. 443.) Cruz had both good and bad days. (R. 444.) Dr. Virey estimated that Cruz would be absent from work two to three times per month. (R. 444.)

---

[2]      ALJ Hornblass referred to Dr. Virey as "Dr. Vipsy," having misread his signature.

15

**ALJ Hornblass' Decision**

On November 30, 2010, ALJ Hornblass denied Cruz's application for SSI benefits in a written decision. (R. 9-19.) ALJ Hornblass reviewed Cruz's claim of disability resulting from abdominal pain and depression, considering both Cruz's testimony and the medical record. (R. 14-19.)

ALJ Hornblass applied the appropriate five step legal analysis (R. 12-14), as follows: First, ALJ Hornblass found that Cruz had not "engaged in substantial gainful activity since August 4, 2009, the application date." (R. 14.) Second, ALJ Hornblass determined that Cruz had "severe impairments: chronic pain syndrome status post hernia repair and infection and depression" which "cause more than minimal functional limitations." (R. 14.) Third, ALJ Hornblass found that Cruz did "not have an impairment or combination of impairments that meets or medically equals one of the listed impairments." (R. 14.)

At this stage, ALJ Hornblass also made a determination as to Cruz's residual functional capacity. (R. 15-17.) ALJ Hornblass determined that Cruz retained "the residual functional capacity to perform the full range of sedentary work," finding that Cruz "can lift and carry 10 pounds occasionally, sit for 6 hours, and stand and walk for 2 hours in an 8-hour workday. He can perform unskilled work." (R. 15.) In making this determination, ALJ Hornblass made a credibility determination about Cruz's testimony: Cruz's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Cruz's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 16.)

ALJ Hornblass gave "great weight" to the findings of consultive physician Dr. Moussa because they were "consistent with the record as a whole." (R. 17.) Dr. Moussa found that

Cruz had "moderate limitations in bending, walking and lifting due to surgical wound infection." (R. 17.) These findings, ALJ Hornblass noted, are "consistent with a residual functional capacity for sedentary work." (R. 17.) Because ALJ Hornblass did not receive any treatment notes from Dr. Virey, he gave "little weight" to Dr. Virey's opinion that Cruz was unable to work for at least one year due to his condition. (R. 17.) With regard to Cruz's mental health, ALJ Hornblass noted that Cruz was "making significant improvement" in therapy and responded well to medication with no side effects. (R. 17.) ALJ Hornblass also noted that Cruz "has no problems paying attention, completing tasks, following written or oral instructions, or getting along with others." (R. 17.)

At the fourth step, ALJ Hornblass determined that Cruz was "unable to perform any past relevant work." (R. 18.) Further, ALJ Hornblass found that Cruz was "32 years old, which is defined as a younger individual age 18-44, on the date the application was filed"; Cruz had "at least a high school education and is able to communicate in English"; and "[t]ransferability of job skills is not material to the determination of disability." (R. 18.)

At the last step, ALJ Hornblass found that, "[c]onsidering [Cruz's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [he] can perform." (R. 18.) ALJ Hornblass, employing the Medical-Vocational Guidelines for those capable of performing sedentary work, explained that, "considering [Cruz's] age, education, and work experience, a finding of 'not disabled' is directed by Medical-Vocational Rule 201.28." (R. 18.) ALJ Hornblass concluded that Cruz was not "under a disability, as defined in the Social Security Act, [from] August 4, 2009, the date the application was filed," through the date of the decision, November 30, 2010. (R. 18-19.)

On December 13, 2010, Cruz requested review by the Appeals Council. (R. 7, 182-88.) The Appeals Council received Dr. Virey's Multiple Impairment Questionnaire about Cruz's

17

conditions (R. 437), but found that the "additional evidence . . . does not provide a basis for changing the Administrative Law Judge's decision." (R. 1-2.) On August 27, 2012, the Appeals Council denied Cruz's request for review of ALJ Hornblass' decision and it became the Commissioner's final decision. (R. 1-3.)

## ANALYSIS

## I.   THE APPLICABLE LAW

### A.   Definition Of Disability

A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see, e.g., Barnhart v. Thomas, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); Barnhart v. Walton, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); Impala v. Astrue, 477 F. App'x 856, 857 (2d Cir. 2012).[3/]

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work

---

[3/]   See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Surgeon v. Comm'r of Soc. Sec., 190 F. App'x 37, 39 (2d Cir. 2006); Rodriguez v. Barnhart, 163 F. App'x 15, 16 (2d Cir. 2005); Malone v. Barnhart, 132 F. App'x 940, 941 (2d Cir. 2005); Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A)-(B), 1382c(a)(3)(B), (G); see, e.g., Barnhart v. Thomas, 540 U.S. at 23, 124 S. Ct. at 379; Barnhart v. Walton, 535 U.S. at 218, 122 S. Ct. at 1270; Salmini v. Comm'r of Soc. Sec., 371 F. App'x at 111; Betances v. Comm'r of Soc. Sec., 206 F. App'x at 26; Butts v. Barnhart, 388 F.3d at 383; Draegert v. Barnhart, 311 F.3d at 472.[4/]

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider:  "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[5/]

## B.    **Standard Of Review**

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record as a whole to support such determination.  E.g., 42 U.S.C. § 405(g); Giunta v. Comm'r of Soc. Sec., 440 F. App'x 53, 53 (2d Cir. 2011); Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003).[6/]  "'Thus, the role of the district court is

---

[4/]    See also, e.g., Shaw v. Chater, 221 F.3d at 131-32; Rosa v. Callahan, 168 F.3d at 77; Balsamo v. Chater, 142 F.3d at 79.

[5/]    See, e.g., Brunson v. Callahan, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); Brown v. Apfel, 174 F.3d at 62; Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983).

[6/]    See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Acierno v. Barnhart, 475 F.3d 77, 80-81 (2d Cir.), cert. denied, 551 U.S. 1132, 127 S. Ct. 2981 (2007); Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004); Jasinski v. Barnhart, 341 F.3d 182, 184 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Shaw v. (continued...)

19

quite limited and substantial deference is to be afforded the Commissioner's decision.'" Morris v.

Barnhart, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y. July 26, 2002) (Peck, M.J.).[7]

        The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla

[and] such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'" Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); accord, e.g.,

Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013); Rosa v. Callahan, 168 F.3d at 77; Tejada v.

Apfel, 167 F.3d at 773-74.[8] "[F]actual issues need not have been resolved by the [Commissioner]

in accordance with what we conceive to be the preponderance of the evidence." Rutherford v.

Schweiker, 685 F.2d 60, 62 (2d Cir. 1982), cert. denied, 459 U.S. 1212, 103 S. Ct. 1207 (1983). The

Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if

_____

(...continued)

    Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 61 (2d Cir. 1999);
    Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d
    Cir. 1999); Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41,
    46 (2d Cir. 1996); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991); Mongeur v. Heckler,
    722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam); Dumas v. Schweiker, 712 F.2d 1545, 1550
    (2d Cir. 1983).

[7]    See also, e.g., Karle v. Astrue, 12 Civ. 3933, 2013 WL 2158474 at *9 (S.D.N.Y. May 17,
    2013) (Peck, M.J.); Santiago v. Astrue, 11 Civ. 6873, 2012 WL 1899797 *13 (S.D.N.Y. May
    24, 2012) (Peck, M.J.); Duran v. Barnhart, 01 Civ. 8307, 2003 WL 103003 at *9 (S.D.N.Y.
    Jan. 13, 2003); Florencio v. Apfel, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec.
    9, 1999) (Chin, D.J.) ("The Commissioner's decision is to be afforded considerable
    deference; the reviewing court should not substitute its own judgment for that of the
    Commissioner, even if it might justifiably have reached a different result upon a de novo
    review." (quotations & alterations omitted)).

[8]    See also, e.g., Halloran v. Barnhart, 362 F.3d at 31; Jasinski v. Barnhart, 341 F.3d at 184;
    Green-Younger v. Barnhart, 335 F.3d at 106; Veino v. Barnhart, 312 F.3d at 586; Shaw v.
    Chater, 221 F.3d at 131; Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000); Brown v. Apfel,
    174 F.3d at 61; Perez v. Chater, 77 F.3d at 46.

it might justifiably have reached a different result upon a de novo review.'" Jones v. Sullivan, 949

F.2d 57, 59 (2d Cir. 1991).[2]

The Court, however, will not defer to the Commissioner's determination if it is "'the

product of legal error.'" E.g., Duvergel v. Apfel, 99 Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y.

Mar. 29, 2000) (Peck, M.J.); see also, e.g., Douglass v. Astrue, 496 F. App'x 154, 156 (2d Cir.

2012); Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004), amended on other grounds, 416 F.3d 101

(2d Cir. 2005); Tejada v. Apfel, 167 F.3d at 773 (citing cases).

The Commissioner's regulations set forth a five-step sequence to be used in

evaluating disability claims. 20 C.F.R. §§ 404.1520, 416.920; see, e.g., Barnhart v. Thomas, 540

U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); Bowen v. Yuckert, 482 U.S. 137, 140, 107 S. Ct.

2287, 2291 (1987). The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, the agency has promulgated regulations establishing a five-step sequential evaluation process to determine disability. If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. [1] At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity." [2] At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." [3] At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. [5] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

---

[2]    See also, e.g., Campbell v. Astrue, 465 F. App'x 4, 6 (2d Cir. 2012); Veino v. Barnhart, 312 F.3d at 586.

Barnhart v. Thomas, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. & citations omitted); accord, e.g.,

Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012); Rosa v. Callahan, 168 F.3d at 77; Tejada v.

Apfel, 167 F.3d at 774.[10]

The claimant bears the burden of proof as to the first four steps; if the claimant meets

the burden of proving that he cannot return to his past work, thereby establishing a prima facie case,

the Commissioner then has the burden of proving the last step, that there is other work the claimant

can perform considering not only his medical capacity but also his age, education and training. See,

e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[11]

## C.   The Treating Physician Rule

The "treating physician's rule" is a series of regulations set forth by the Commissioner

in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion.

Specifically, the Commissioner's regulations provide that:

> If we find that a treating source's opinion on the issue(s) of the nature and severity
> of your impairment(s) is well-supported by medically acceptable clinical and
> laboratory diagnostic techniques and is not inconsistent with the other substantial
> evidence in your case record, we will give it controlling weight.

---

[10]   See also, e.g., Jasinski v. Barnhart, 341 F.3d at 183-84; Green-Younger v. Barnhart, 335
F.3d at 106; Shaw v. Chater, 221 F.3d at 132; Brown v. Apfel, 174 F.3d at 62; Balsamo v.
Chater, 142 F.3d 75, 79-80 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d at 501; Perez v. Chater,
77 F.3d at 46; Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); Berry v. Schweiker, 675
F.2d 464, 467 (2d Cir. 1982).

[11]   See also, e.g., Selian v. Astrue, 708 F.3d at 418; Betances v. Comm'r of Soc. Sec., 206 F.
App'x at 25, 26 (2d Cir. 2006); Green-Younger v. Barnhart, 335 F.3d at 106; Rosa v.
Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d at
467.

20 C.F.R. § 404.1527(d)(2); see, e.g., Meadors v. Astrue, 370 F. App'x 179, 182 (2d Cir. 2010); Colling v. Barnhart, 254 F. App'x 87, 89 (2d Cir. 2007); Lamorey v. Barnhart, 158 F. App'x 361, 362 (2d Cir. 2006).[12/]

Further, the regulations specify that when controlling weight is not given a treating physician's opinion (because it is not "well supported" by other medical evidence), the ALJ must consider the following factors in determining the weight to be given such an opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant. 20 C.F.R. § 404.1527(d)(2)-(6); see, e.g., Gunter v. Comm'r of Soc. Sec., 361 F. App'x 197, 197 (2d Cir. 2010); Foxman v. Barnhart, 157 F. App'x at 346-47; Halloran v. Barnhart, 362 F.3d at 32; Shaw v. Chater, 221 F.3d at 134; Clark v. Comm'r of Soc. Sec., 143 F.3d at 118; Schaal v. Apfel, 134 F.3d at 503.[13/]

---

[12/]   See also, e.g., Foxman v. Barnhart, 157 F. App'x 344, 346 (2d Cir. 2005); Tavarez v. Barnhart, 124 F. App'x 48, 49 (2d Cir. 2005); Donnelly v. Barnhart, 105 F. App'x 306, 308 (2d Cir. 2004); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Kamerling v. Massanari, 295 F.3d 206, 209 n.5 (2d Cir. 2002); Jordan v. Barnhart, 29 F. App'x 790, 792 (2d Cir. 2002); Bond v. Soc. Sec. Admin., 20 F. App'x 20, 21 (2d Cir. 2001); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998).

[13/]   See also, e.g., Kugielska v. Astrue, 06 Civ. 10169, 2007 WL 3052204 at *8 (S.D.N.Y. Oct. 16, 2007); Hill v. Barnhart, 410 F. Supp. 2d 195, 217 (S.D.N.Y. 2006); Klett v. Barnhart, 303 F. Supp. 2d 477, 484 (S.D.N.Y. 2004); Rebull v. Massanari, 240 F. Supp. 2d 265, 268 (S.D.N.Y. 2002).

When a treating physician provides a favorable report, the claimant "is entitled to an express recognition from the [ALJ or] Appeals Council of the existence of [the treating physician's] favorable . . . report and, if the [ALJ or] Council does not credit the findings of that report, to an explanation of why it does not." Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999); see, e.g., Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010) (ALJ's failure to consider favorable treating physician evidence ordinarily requires remand pursuant to Snell but does not require remand where the report was "essentially duplicative of evidence considered by the ALJ"); Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) ("We of course do not suggest that every conflict in a record be reconciled by the ALJ or the Secretary, but we do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable [reviewing courts] to decide whether the determination is supported by substantial evidence." (citations omitted)); Ramos v. Barnhart, 02 Civ. 3127, 2003 WL 21032012 at *7, *9 (S.D.N.Y. May 6, 2003) (The ALJ's "'failure to mention such [treating physician report] evidence and set forth the reasons for his conclusions with sufficient specificity hinders [this Court's] ability . . . to decide whether his determination is supported by substantial evidence.'").

The Commissioner's "treating physician" regulations were approved by the Second Circuit in Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993).

**D.    The ALJ's Duty To Develop The Record**

It is the "well-established rule in [the Second] circuit" that the ALJ must develop the record, even where, as here, the claimant was represented by counsel:

> Even when a claimant is represented by counsel, it is the well-established rule in our circuit "that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 508-09 (2d Cir. 2009) (internal quotation marks and brackets omitted)[, cert. denied, 559 U.S. 962, 130 S. Ct. 1503 (2010)]; accord Butts v. Barnhart, 388 F.3d 377, 386 (2d Cir. 2004), reh'g granted in part and denied in part, 416 F.3d 101

(2d Cir. 2005); Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996); see also Gold v. Sec'y of Health Educ. & Welfare, 463 F.2d 38, 43 (2d Cir. 1972) (pro se claimant). Social Security disability determinations are "investigatory, or inquisitorial, rather than adversarial." Butts, 388 F.3d at 386 (internal quotation marks omitted). "[I]t is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits." Id. (internal quotation marks omitted); accord Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999).

Moran v. Astrue, 569 F.3d 108, 112-13 (2d Cir. 2009).[14]

## II.   APPLICATION OF THE FIVE-STEP SEQUENCE TO CRUZ'S CLAIM

### A.   Cruz Was Not Engaged In Substantial Gainful Activity

The first inquiry is whether Cruz was engaged in substantial gainful activity after his application for SSI benefits. "Substantial gainful activity" is defined as work that involves "doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510. ALJ Hornblass' conclusion that Cruz did not engage in substantial gainful activity during the applicable time period (see page 15 above) is not contested by the Commissioner (see generally Dkt. No. 16: Comm'r Br. at 18-25). The Court therefore proceeds to the second step of the five-step analysis.

### B.   Cruz Demonstrated "Severe" Impairments That Significantly Limited His Ability To Do Basic Work Activities

The second step of the analysis is to determine whether Cruz proved that he had a severe impairment or combination of impairments that "significantly limit[ed his] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). The ability to do basic work activities

---

[14]   See also, e.g., 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. §§ 404.1512(d), 416.912(d), 416.912(e)(2); Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008); Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996); Echevarria v. Sec'y of Health & Human Servs., 685 F.2d 751, 755 (2d Cir. 1982); Torres v. Barnhart, 02 Civ. 9209, 2007 WL 1810238 at *9 (S.D.N.Y. June 25, 2007) (Peck, M.J.) (& cases cited therein).

is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b).
"Basic work activities" include:

> walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling
> . . . seeing, hearing, and speaking . . . [u]nderstanding, carrying out, and
> remembering simple instructions . . . [u]se of judgment . . . [r]esponding
> appropriately to supervision, co-workers and usual work situations . . . [d]ealing with
> changes in a routine work setting.

20 C.F.R. § 404.1521(b)(1)-(6). The Second Circuit has warned that the step two analysis may not

do more than "screen out de minimis claims." Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995).

"[T]he 'mere presence of a disease or impairment, or establishing that a person has been diagnosed

or treated for a disease or impairment' is not, by itself, sufficient to render a condition 'severe.'"

McDowell v. Colvin, No. 11-CV-1132, 2013 WL 1337152 at *6 (N.D.N.Y. Mar. 11, 2013), report

& rec. adopted, 2013 WL 1337131 (N.D.N.Y. Mar. 29, 2013).[15]

"A finding that a condition is not severe means that the plaintiff is not disabled, and

the Administrative Law Judge's inquiry stops at the second level of the five-step sequential

evaluation process." Rosario v. Apfel, No. 97 CV 5759, 1999 WL 294727 at *5 (E.D.N.Y. Mar. 19,

---

[15] Accord, e.g., Whiting v. Astrue, Civ. Action No. 12-274, 2013 WL 427171 at *2 (N.D.N.Y.
Jan. 15, 2013) ("'The mere presence of a disease or impairment alone . . . is insufficient to
establish disability; instead, it is the impact of the disease, and in particular any limitations
it may impose upon the claimant's ability to perform basic work functions, that is pivotal to
the disability inquiry.'"), report & rec. adopted, 2013 WL 427166 (N.D.N.Y. Feb. 4, 2013);
Lohnas v. Astrue, No. 09-CV-685, 2011 WL 1260109 at *3 (W.D.N.Y. Mar. 31, 2011),
aff'd, No. 11-2383, --- F. App'x ----, 2013 WL 362898 (2d Cir. Jan. 31, 2013); Hahn v.
Astrue, 08 Civ. 4261, 2009 WL 1490775 at *7 (S.D.N.Y. May 27, 2009) (Lynch, D.J.) ("[I]t
is not sufficient that a plaintiff 'establish[] the mere presence of a disease or impairment.'
Rather, 'the disease or impairment must result in severe functional limitations that prevent
the claimant from engaging in any substantial gainful activity.'" (citation omitted));
Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977) ("The mere presence of a
disease or impairment is not disabling within the meaning of the Social Security Act.").

1999).  On the other hand, if the disability claim rises above the de minimis level, then the further

analysis of step three and beyond must be undertaken.  See, e.g., Dixon v. Shalala, 54 F.3d at 1030.

"A finding of 'not severe' should be made if the medical evidence establishes only

a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to

work.'"  Rosario v. Apfel, 1999 WL 294727 at *5 (quoting Bowen v. Yuckert, 482 U.S. 137, 154

n.12, 107 S. Ct. 2287, 2298 n.12 (1987)).

ALJ Hornblass determined that the medical evidence indicated that Cruz's

impairments of "chronic pain syndrome status post hernia repair and infection and depression" were

severe.  (See page 15 above.)  These findings benefit Cruz and are not disputed.  (See generally Dkt.

No. 16: Comm'r Br. at 18-25.)  The Court therefore proceeds to the third step of the five-part

analysis.

### C.    Cruz Did Not Have A Disability Listed In Appendix 1 Of The Regulations

The third step of the five-step test requires a determination of whether Cruz had an

impairment listed in Appendix 1 of the Regulations.  20 C.F.R., Pt. 404, Subpt. P, App. 1.  "These

are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude

gainful employment.  If a claimant's condition meets or equals the 'listed' impairments, he or she is

conclusively presumed to be disabled and entitled to benefits."  Dixon v. Shalala, 54 F.3d 1019,

1022 (2d Cir. 1995).

ALJ Hornblass found that Cruz's impairments did not meet or equal the severity of

any of the listed impairments.  (Dkt. No. 9: R. 14.)  Specifically, ALJ Hornblass found that Cruz's

mental impairments did not satisfy the requirements of the impairments in § 12.04 of the Listings.

(R. 14-15.)  ALJ Hornblass determined that Cruz failed to meet both the "'paragraph B'" and

"'paragraph C'" criteria because he had only "mild restriction in activities of daily living, moderate

difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation" and was "able to function independently outside of a structured setting." (R. 14-15.) Similarly, ALJ Hornblass found that Cruz's physical ailments do "not result in any functional limitations that meet or equal any listing level physical impairment." (R. 14.)[16/]

Because the finding that Cruz's impairments do not meet or medically equal the listed conditions is not disputed by the parties and is supported by substantial evidence (see generally Dkt. No. 12: Cruz Br. at 9, 12-16; Dkt. No. 16: Comm'r Br. at 17), the Court proceeds with the five-step analysis. Before proceeding to step four, the Court will address ALJ Hornblass' credibility and residual functional capacity determinations.

### 1.    Credibility Determination

Because subjective symptoms like pain only lessen a claimant's residual functional capacity ("RFC") where the symptoms "'can reasonably be accepted as consistent with the objective medical evidence and other evidence,' the ALJ is not required to accept allegations regarding the extent of symptoms that are inconsistent with the claimant's statements or similar evidence." Moulding v. Astrue, 08 Civ. 9824, 2009 WL 3241397 at *7 (S.D.N.Y. Oct. 8, 2009) (citation & emphasis omitted); see, e.g., Campbell v. Astrue, 465 F. App'x 4, 7 (2d Cir. 2012) ("As for the ALJ's credibility determination, while an ALJ 'is required to take the claimant's reports of pain and other

---

[16/]    ALJ Hornblass referenced "claimant's obesity" as the physical impairment and did not mention Cruz's abdominal pain. (R. 14.) Cruz's physical disability claim, however, was based on abdominal pain and infection, not obesity. (See page 2 above.) At step two, ALJ Hornblass listed "chronic pain syndrome status post hernia repair and infection and depression" as Cruz's impairments. (R. 14.) The mention of obesity as the sole physical impairment in step three seems to be an error. Even so, neither party contests the ultimate finding that Cruz's impairments do not meet or medically equal a listed impairment, and that finding is supported by substantial evidence.

limitations into account,' he or she is 'not require[d] to accept the claimant's subjective complaints without question.'  Rather, the ALJ 'may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.'" (citations omitted)); <u>Genier</u> v. <u>Astrue</u>, 606 F.3d 46, 49 (2d Cir. 2010) ("When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." (citations omitted)); <u>Brown</u> v. <u>Comm'r of Soc. Sec.</u>, 310 F. App'x 450, 451 (2d Cir. 2009) ("Where there is conflicting evidence about a claimant's pain, the ALJ must make credibility findings.").[17/]

Although ALJ Hornblass found that Cruz's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," he concluded that Cruz's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the

---

[17/]    See also, e.g., <u>Rivers</u> v. <u>Astrue</u>, 280 F. App'x 20, 22 (2d Cir. 2008) (same); <u>Thompson</u> v. <u>Barnhart</u>, 75 F. App'x 842, 845 (2d Cir. 2003) (The ALJ properly found that plaintiff's "description of her symptoms was at odds with her treatment history, her medication regime and her daily routine."); <u>Snell</u> v. <u>Apfel</u>, 177 F.3d 128, 135 (2d Cir. 1999); <u>Norman</u> v. <u>Astrue</u>, 10 Civ. 5839, --- F. Supp. 2d ----, 2012 WL 4378042 at *46 (S.D.N.Y. Sept. 25, 2012) ("It is 'within the discretion of the [Commissioner] to evaluate the credibility of plaintiff's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true extent of such symptomatology.'"); <u>Astolos</u> v. <u>Astrue</u>, No. 06-CV-678, 2009 WL 3333234 at *12 (W.D.N.Y. Oct. 14, 2009) (The ALJ properly determined that plaintiff's subjective pain complaints were not supported by the medical record.); <u>Speruggia</u> v. <u>Astrue</u>, No. 05-CV-3532, 2008 WL 818004 at *11 (E.D.N.Y. Mar. 26, 2008) ("The ALJ 'does not have to accept plaintiff's subjective testimony about her symptoms without question' and should determine a plaintiff's credibility 'in light of all the evidence.'"); <u>Soto</u> v. <u>Barnhart</u>, 01 Civ. 7905, 2002 WL 31729500 at *6 (S.D.N.Y. Dec. 4, 2002) ("The ALJ has the capacity and the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of pain alleged by the claimant."); <u>Brandon</u> v. <u>Bowen</u>, 666 F. Supp. 604, 608 (S.D.N.Y. 1987) (same).

extent they are inconsistent with the above residual functional capacity assessment." (R. 15-16; see

page 15 above.)

When ruling that a claimant is not entirely credible, the ALJ must provide "specific

reasons for the finding on credibility, supported by the evidence in the case record." SSR 96-7p,

1996 WL 374186 at *4 (July 2, 1996). The regulations set out a two-step process for assessing a

claimant's statements about pain and other limitations:

> At the first step, the ALJ must decide whether the claimant suffers from a medically
> determinable impairment that could reasonably be expected to produce the symptoms
> alleged. . . . If the claimant does suffer from such an impairment, at the second step,
> the ALJ must consider the extent to which the claimant's symptoms can reasonably
> be accepted as consistent with the objective medical evidence and other evidence of
> record. The ALJ must consider statements the claimant or others make about his
> impairments, his restrictions, his daily activities, his efforts to work, or any other
> relevant statements he makes to medical sources during the course of examination
> or treatment, or to the agency during interviews, on applications, in letters, and in
> testimony in its administrative proceedings.

Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (quotations, citation & brackets omitted).[18]

ALJ Hornblass accurately explained this two-step process, but failed to properly

apply it to Cruz. (R. 15-16.) First, ALJ Hornblass' credibility assessment was lacking in specificity.

(R. 16.) While ALJ Hornblass summarized the evidence in the record, he failed to point out which

portion caused him to doubt Cruz's credibility. (R. 16.)

Second, ALJ Hornblass essentially reversed the standard by finding that Cruz was

not credible because Cruz's complaints were not compatible with ALJ Hornblass' own RFC

---

[18]   Accord, e.g., Meadors v. Astrue, 370 F. App'x 179, 183 (2d Cir. 2010); Taylor v. Barnhart,
83 F. App'x 347, 350-51 (2d Cir. 2003); 20 C.F.R. § 416.945(a)(1), (3); SSR 96-7p, 1996
WL 374186 at *2.

determination, as opposed to the objective record evidence. (R. 16.)[19] Neither the Social Security regulations nor this Circuit's caselaw support the idea that an ALJ may discredit a claimant's subjective complaints on the basis of the ALJ's own finding of the claimant's RFC. See, e.g., Caternolo v. Astrue, No. 11-CV-6601, 2013 WL 1819264 at *11-12 (W.D.N.Y. Apr. 29, 2013) (citing Bjornson v. Astrue, 671 F.3d at 645); Perrin v. Astrue, 2012 WL 4793543 at *5 ("[I]t was error for the ALJ to discount [claimant's] complaints because they conflicted with the ALJ's residual functional capacity assessment."); Smollins v. Astrue, 2011 WL 3857123 at *11 ("Instead of comparing [the claimant's] symptoms, as described by [the claimant] herself and her doctors, to the objective medical and other evidence of record as required by the Social Security regulations, [the] ALJ . . . merely compared [the claimant's] statements regarding her symptoms to his own RFC assessment. . . . [The] ALJ . . . failed to follow the dictates of the Social Security regulations in performing his credibility assessment."); Mantovani v. Astrue, 2011 WL 1304148 at *5 ("[T]he ALJ found that Plaintiff's 'medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.' . . . This failure to comply with the regulatory requirements for evaluating Plaintiff's credibility also requires remand.").

---

[19]     This boilerplate language about the claimant's subjective complaints being "inconsistent with the above residual functional capacity assessment" has begun to appear in many ALJ decisions. See, e.g., Bjornson v. Astrue, 671 F.3d 640, 645 (7th Cir. 2012); Ocasio v. Colvin, No. 12-CV-6002, 2013 WL 1395846 at *8 n.22 (E.D.N.Y. Apr. 5, 2013); Otero v. Colvin, No. 12-CV-4757, 2013 WL 1148769 at *7 (E.D.N.Y. Mar. 19, 2013); Perrin v. Astrue, No. 11-CV-5110, 2012 WL 4793543 at *5 (E.D.N.Y. Oct. 9, 2012); Smollins v. Astrue, No. 11-CV-424, 2011 WL 3857123 at *10 (E.D.N.Y. Sept. 1, 2011); Mantovani v. Astrue, No. 09-CV-3957, 2011 WL 1304148 at *5 (E.D.N.Y. Mar. 31, 2011).

The ALJ's conclusory reasoning is unfair to the claimant, whose subjective statements about his symptoms are discarded if they are not compatible with an RFC that has been pre-determined based on other factors. See, e.g., Otero v. Colvin, 2013 WL 1148769 at *7 ("The assessment of a claimant's ability to work will often depend on the credibility of her statements concerning the intensity, persistence and limiting effects of her symptoms. Thus, it makes little sense to decide on a claimant's RFC prior to assessing her credibility."); Smollins v. Astrue, 2011 WL 3857123 at *11 (finding such reasoning "flawed not only in its brevity, but also in its acceptance as a foregone conclusion of [the claimant's] capacity to perform sedentary work"). In order to take proper account of the claimant's symptoms, the ALJ should first determine the extent to which the claimant's symptoms are credible in light of the objective record evidence, and then use that finding as one aspect of the RFC analysis. Determining the RFC first and then measuring the claimant's credibility by that yardstick reverses the standard in a way that is not only illogical, but also prejudicial to the claimant. A remand is necessary in this case. On remand, the ALJ should properly evaluate Cruz's credibiilty and its effect on his residual functional capacity.

## 2. Residual Functional Capacity Determination

ALJ Hornblass determined that Cruz retained "the residual functional capacity to perform the full range of sedentary work as defined in 20 CFR 416.967(a). He can lift and carry 10 pounds occasionally, sit for 6 hours, and stand and walk for 2 hours in an 8-hour workday. He can perform unskilled work." (See page 15 above.)[20]

Cruz contends that the ALJ violated the treating physician rule in failing to afford adequate weight to the opinions of Dr. Branson and Kennedy about Cruz's mental health. (Dkt. No.

[20]   Because the record will be further developed on remand (see page 33 below), the Court need not determine whether this finding is supported by substantial evidence.

12: Cruz Br. at 8-12.) Cruz's claim is without merit because the medical findings of Dr. Branson and Kennedy were equivocal as to Cruz's work capacity (see pages 8-13 above) and because the ultimate determination of a claimant's ability to work is reserved to the Commissioner. See, e.g., Roma v. Astrue, 468 F. App'x 16, 18 (2d Cir. 2012); Priel v. Astrue, 453 F. App'x 84, 86 (2d Cir. 2011); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). Cruz relies heavily on a July 9, 2010 letter to Cruz's attorneys, signed by Dr. Branson and Kennedy. (Cruz Br. at 9-12.) This letter, however, merely contains qualified language about how Cruz was "temporarily unable to resume work related activity." (See page 12 above.) Cruz's mental health treatment records, which were reviewed by ALJ Hornblass, indicate that both Dr. Branson and Kennedy were skeptical that Cruz qualified for disability benefits on the basis of mental health. (See page 13 above.) ALJ Hornblass fully credited the findings of Dr. Branson and Kennedy, including that Cruz had depressive disorder NOS but improved with treatment and responded well to medication. (See pages 15-16 above.) While the medical findings of Dr. Branson and Kennedy were entitled to and received due deference, their statement that Cruz was "temporarily unable to resume work" was, as a non-medical finding, not entitled to any special significance. See, e.g., Micheli v. Astrue, No. 11-4756-cv, 2012 WL 5259138 at *2 (2d Cir. Oct. 25, 2012) ("Nevertheless, '[a] treating physician's statement that the claimant is disabled cannot itself be determinative.' It is the Commissioner who is 'responsible for making the determination or decision about whether [the claimant] meet[s] the statutory definition of disability.'" (citation omitted)); Roma v. Astrue, 468 F. App'x at 18; Priel v. Astrue, 453 F. App'x at 86; Snell v. Apfel, 177 F.3d at 133 ("[S]ome kinds of findings—including the ultimate finding of whether a claimant is disabled and cannot work—are 'reserved to the Commissioner.' That means that the Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability. A treating physician's statement that the

33

claimant is disabled cannot itself be determinative." (citation omitted)); DiPalma v. Colvin, 12 Civ. 6708, 2013 WL 3243554 at *16 (S.D.N.Y. June 28, 2013) (Peck, M.J.); Karle v. Astrue, 12 Civ. 3933, 2013 WL 2158474 at *16 (S.D.N.Y. May 17, 2013) (Peck, M.J.) (The "treating physician's opinion on disability is not given any special significance."). ALJ Hornblass did not violate the treating physician rule as to Dr. Branson and Kennedy.

Cruz also contends that ALJ Hornblass violated the duty to develop the record because he did not request any medical records from Dr. Virey. (Cruz Br. at 12-15.) Cruz further contends that ALJ Hornblass violated the treating physician rule in affording Dr. Virey's opinion "little weight" due to the lack of records. (Cruz Br. at 12.) Because the ALJ's failure to appropriately evaluate Cruz's credibility (see pages 27-31 above) and error in relying solely on the Grid (see pages 34-37 below) requires remand in any event, on remand the ALJ should obtain and consider additional medical records from Dr. Virey, and explore the rationale for Dr. Virey's Multiple Impairment Questionnaire findings about Cruz's work capacity. (See page 14 above.)

### D.   Cruz Did Not Have The Ability To Perform His Past Work

The fourth step of the five-step analysis asks whether Cruz had the residual functional capacity to perform his past relevant work. (See page 20 above.) Cruz previously worked as a tutor, cab driver, parking lot attendant, and messenger. (See page 2 above.) Finding that these positions "entail job activities that exceed [Cruz's] residual functional capacity," ALJ Hornblass concluded that Cruz was "unable to perform any past relevant work." (See page 16 above.) Because this finding favors Cruz and is not contested by the Commissioner (see generally Dkt. No. 16: Comm'r Br. at 24-25), the Court proceeds to the fifth and final step of the analysis.

### E.      The ALJ Erred In Treating The Grid As Dispositive When There Was Substantial Evidence That Cruz Had Nonexertional Limitations

In the fifth step, the burden shifts to the Commissioner, "who must produce evidence to show the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform, considering not only his physical capability, but as well his age, his education, his experience and his training." Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980).[21/]

> In meeting his burden under the fifth step, the Commissioner:
>
> may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the Grid." The Grid takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience. Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy. Generally the result listed in the Grid is dispositive on the issue of disability.

Zorilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996) (fn. omitted); see, e.g., Heckler v. Campbell, 461 U.S. 458, 461-62, 465-68, 103 S. Ct. 1952, 1954-55, 1956-58 (1983) (upholding the promulgation of the Grid); Roma v. Astrue, 468 F. App'x at 20-21; Martin v. Astrue, 337 F. App'x 87, 90 (2d Cir. 2009); Rosa v. Callahan, 168 F.3d at 78; Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986). "The Grid classifies work into five categories based on the exertional requirements of the different jobs. Specifically, it divides work into sedentary, light, medium, heavy and very heavy, based on the extent of requirements in the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, and pulling."

---

[21/]     See, e.g., Roma v. Astrue, 468 F. App'x 16, 20 (2d Cir. 2012); Arruda v. Comm'r of Soc. Sec., 363 F. App'x 93, 95 (2d Cir. 2010); Butts v. Barnhart, 388 F.3d 377, 381 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Curry v. Apfel, 209 F.3d 117, 122-23 (2d Cir. 2000); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999).

Zorilla v. Chater, 915 F. Supp. at 667 n.2; see 20 C.F.R. § 404.1567.  Taking account of the

claimant's residual functional capacity, age, education, and prior work experience, the Grid yields

a decision of "disabled" or "not disabled." 20 C.F.R. § 404.1569; 20 C.F.R., Pt. 404, Subpt. P, App.

2, § 200.00(a).

However, "relying solely on the Grids is inappropriate when nonexertional limitations

'significantly diminish' plaintiff's ability to work so that the Grids do not particularly address

plaintiff's limitations." Vargas v. Astrue, 10 Civ. 6306, 2011 WL 2946371 at *13 (S.D.N.Y. July

20, 2011); see also, e.g., Travers v. Astrue, 10 Civ. 8228, 2011 WL 5314402 at *10 (S.D.N.Y. Nov.

2, 2011) (Peck, M.J.), report & rec. adopted, 2013 WL 1955686 (S.D.N.Y. May 13, 2013); Lomax

v. Comm'r of Soc. Sec., No. 09-CV-1451, 2011 WL 2359360 at *3 (E.D.N.Y. June 6, 2011) ("Sole

reliance on the grids is inappropriate, however, where a claimant's nonexertional impairments

'significantly limit the range of work permitted by his exertional limitations.'").

Rather, where the claimant's nonexertional limitations "'significantly limit the range

of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational

expert." Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010) (quoting Bapp v. Bowen, 802 F.2d at

605); see also, e.g., Selian v. Astrue, 708 F.3d 409, 421 (2d Cir. 2013) ("We have explained that the

ALJ cannot rely on the Grids if a non-exertional impairment has any more than a 'negligible' impact

on a claimant's ability to perform the full range of work, and instead must obtain the testimony of

a vocational expert."); Rosa v. Callahan, 168 F.3d at 82 ("Where significant nonexertional

impairments are present at the fifth step in the disability analysis, however, 'application of the grids

is inappropriate.' Instead, the Commissioner 'must introduce the testimony of a vocational expert

(or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.'"

(quoting & citing Bapp)); Suarez v. Comm'r of Soc. Sec., No. 09-CV-338, 2010 WL 3322536 at *9

(E.D.N.Y. Aug. 20, 2010) ("If a claimant has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." (quoting Zabala)).[22]

ALJ Hornblass accurately related the above standard for use of the Grid, but did not properly apply the standard to Cruz's claim. ALJ Hornblass wrote:

> Based on a residual functional capacity for the full range of sedentary work, considering the claimant's age, education, and work experience, a finding of "not disabled" is directed by Medical-Vocational Rule 201.28.

(R. 18, emphasis added.) ALJ Hornblass did not explain why he treated the Grid as dispositive, despite evidence in the record of Cruz's nonexertional limitations, including depression and chronic pain syndrome. (R. 18.) If ALJ Hornblass treated the Grid as dispositive because he found that Cruz's nonexertional limitations did not significantly reduce, or only had a negligible impact on, Cruz's work capacity, ALJ Hornblass was obligated to explain that finding. See, e.g., Pratts v. Chater, 94 F.3d 34, 38-39 (2d Cir. 1996); Bapp v. Bowen, 802 F.2d at 605-06; see also, e.g., Tucker v. Heckler, 776 F.2d 793, 796 (8th Cir. 1985); Smith v. Schweiker, 719 F.2d 723, 724-25 & n.1 (4th Cir. 1984). The record, however, demonstrates that Cruz's nonexertional limitations may have had

---

[22]     Although the Grid is not dispositive in such cases, it still provides a framework to guide the ALJ's decision. See, e.g., Travers v. Astrue, 2011 WL 5314402 at *10 n.18; Jones v. Astrue, 09 Civ. 5577, 2011 WL 3423771 at *12 (S.D.N.Y. July 15, 2011) (The Grid "serve[s] as a 'framework' for determining whether a claimant with a nonexertional limitation is disabled."), report & rec. adopted, 2012 WL 4473258 (S.D.N.Y. Sept. 28, 2012); Clobridge v. Astrue, No. 07-CV-00691, 2010 WL 3909500 at *11 (N.D.N.Y. Sept. 30, 2010) ("If a plaintiff's situation fits well within a particular classification, then resort to the grids is appropriate. If, on the other hand, nonexertional impairments, including pain, significantly limit the range of work permitted by exertional limitations, then use of the grids is inappropriate, in which case further evidence and/or testimony is required. In such cases, the ALJ may rely on the grids only as a framework for decision-making." (citations omitted)); Paulino v. Astrue, 08 Civ. 02813, 2010 WL 3001752 at *26 (S.D.N.Y. July 30, 2010) (Peck, M.J.) ("While the Grid is not dispositive in cases where the claimant has nonexertional limits . . . , the Grid certainly serves as a framework to guide the ALJ's decision.").

more than a negligible impact on his ability to work. Cruz was diagnosed by multiple physicians with chronic abdominal pain and depressive disorder NOS. (See pages 6-10, 12 above.) According to those physicians, Cruz's depression and chronic pain could interfere with his ability to concentrate, which would impact his capacity for sedentary work. (See pages 9, 12, 14 above.) In addition, Cruz's lack of interest, apprehensiveness and low energy and problems sleeping also could affect Cruz's RFC (see pages 9, 11-12 above), as could his need to miss work for medical appointments (see pages 3, 6, 14 above).

Under these circumstances, the ALJ was required to seek the opinion of a vocational expert rather than relying exclusively on the Grid. ALJ Hornblass' conclusion that the Grid "directed" a finding of "not disabled" and his failure to consult a vocational expert are legal errors that necessitate remand.

## CONCLUSION

For the reasons discussed above, the Commissioner's motion for judgment on the pleadings (Dkt. No. 15) should be DENIED and Cruz's motion for judgment on the pleadings (Dkt. No. 11) should be GRANTED to the extent of remanding the case to the Commissioner for further proceedings consistent with this Report and Recommendation.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Paul A. Crotty, 500 Pearl Street, Room 735, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Crotty (with

a courtesy copy to my chambers). Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); Ingram v. Herrick, 475 F. App'x 793, 793 (2d Cir. 2012); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822, 115 S. Ct. 86 (1994); Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.), cert. denied, 506 U.S. 1038, 113 S. Ct. 825 (1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:      New York, New York
           July 2, 2013

Respectfully submitted,

**Andrew J. Peck**
United States Magistrate Judge

Copies ECF to: All Counsel
                Judge Paul A. Crotty